Good morning, your honors. I'm Craig Price. I'm here on behalf of the appellant, Carla Abatie, who is in the courtroom this morning. I would like to start by providing you with what I think is the most vivid demonstration of why the federal judiciary had its decision affected in reaching the final determination it did. Obviously, that's the test that we're looking at. After ALTA had been presented with a mountain of evidence, of unrebutted evidence, by Dr. Abatie's employer, that there were lost records, which the employer found, that demonstrated that the employer had timely submitted a request for a waiver of premium. Is that where all these memos come from? The memos to the file and so on that are referred to in the briefs? That's correct, Judge. But the problem, as I understand it, is there's nothing on the insurance company's side that reflects any receipt of such notification. That's absolutely correct. So we have, first, the memos that were found, and then the depositions that were taken, including of the person who wrote the memo, who actually processed the request for the waiver, and who actually got the word back that the waiver was approved and made a contemporaneous notation of that in the files. We have all of that and more. And against that, we have a letter in the final determination of denial in June of 2002, in which Mr. Grant at Alta stated that they had made a very diligent search. They could find not even a record concerning Dr. Avedi and no record of a waiver. Well, I would point out, as I'm sure that the Court may already be aware, that one month, excuse me, two months after that, the end of August, short time before trial, suddenly Alta discovered that there was a number of file materials that they had not previously located. And they submitted them to plaintiff, and they were put in evidence. These records included the very policy that is the subject of the action here, because before that, they couldn't locate it. These records also included a roster of their insurers showing that Dr. Avedi was insured by them in 1997. And I know we're not arguing the evidence here, and I don't mean to get sidetracked, but I think it illustrates that the significance to which the trial court should have accorded Alta's claim that they had made this diligent search, and that was the only basis that they had to refute all of the evidence in support of the existence of the waiver, may not have been very diligent. Mr. Price, isn't part of the problem here that we went through a series of insurance companies? Alta was not the insurer that issued the original policy to the Santa Barbara Clinic, was it? You're absolutely right, Your Honor. It was re-inherited. And weren't there a couple of changes of insurance companies? Yes, Alta was the third generation. So what we were really looking for, I guess, would be the files of the other two insurance companies that theoretically should have been turned over to Alta when it subsequently acquired the business? When theoretically the original records would have been turned over by the first insurance company to the second insurance company, and then on to Alta? And I think that the point that you're making illustrates how easily it may have happened that records were lost. Likewise, there's the employer's records that have no letter, no communication in writing, no amendment of a contract or a writer to a policy. Any document that would demonstrate the fact asserted, right? Well, that's right. The only place where it's absolutely right, but the only place where I would differ with you is that. Well, it just doesn't exist. I mean, I agree, Your Honor. However, when somebody submits a waiver of premium, it's not like processing a request for lifetime,  No, but it is. It's not a lot of paper. It's a matter of an employer's accounting department to now take that particular item off the do list every month, the payment list. Obviously, they stopped paying premium. Yes, they did. And in response to something, I don't know whether they just abandoned the policy or thought there was termination or what happened, or that the insurance company didn't exist anymore. There's no explanation of that in the record. Well, as I'm sure the Court is aware, and this is in the record, this is a self-administered plan. And it means that the people at the Sansum Clinic and the administrative staff tally the numbers of people that are insured. They add it up. They figure out how much has to be paid, and they submit it. There are no extensive records kept of individual insurance, which are transmitted from the carrier to ALTA itself, from Sansum, rather. Going back to Judge Tallman's point, and I don't know that this is an excuse, because I'm not here representing the clinic. But at some point in time, after Dr. Abate went off on disability, the Santa Barbara Medical Foundation Clinic, which was one of the two largest clinics in that area, merged with the Sansum Medical Clinic, creating an even larger organization. Now, when this claim was originally submitted after Dr. Abate died by the clinic, they couldn't find any records. And it was only after Mrs. Abate's legal representation commenced that there was an effort made by me to go back to the clinic and see exactly what Judge Beezer just said, and that is, come on, you guys. You have to have something. Are you sure? Have you looked everywhere? And based upon what's in the record of this case, from a deposition of Carol Hershey, they went back as a result of that request, and they found some of these documents in somebody's desk. Now, I submit to you that there was, to say that there was imperfect record keeping would be a gross misunderstatement. And that applies to both the clinic, and it applies to Alta Insurance. But I would submit that that deference should be given to Mrs. Abate in that she bears no direct responsibility for any of that. Well, obviously, Mrs. Abate is in a very sympathetic position, and we understand that. But you came on fairly strongly at the outset of your argument that the administrator suffered here from a terrible conflict of interest. And then your proof of that argument lies in the record keeping. But the problem I'm having coming to the same legal conclusion that you come to is that all of these missing records do not sound to me to be evidence that would lead the administrator to have a conflict of interest. It's not intentional misconduct. It's not hiding information from the claimant. I mean, it's a problem that we live in, in a world of corporate takeovers, and mergers, and acquisitions. I'm having a hard time getting to your legal conclusion. I couldn't agree more, and that's because I didn't get to my conclusion as to why I think there's a conflict. My point simply was that when faced with the new evidence that was presented, Alta then, I believe, in an effort to stave off the need to pay this claim, demonstrated its conflict, demonstrated it in a way in which it was obviously influenced in making its decision. And going back to what I started, I think the most vivid may not be the most legalistic or the best legal argument I have. We all see those two. We record here, too. So when you shift away, your words will be lost to posterity. Perhaps I should step further away, then. No, no, stay right where you are. Just don't wander too far. As you're all aware, when Alta turned down, made their final determination of June 2002, they not only relied on their old interpretation of the 12-month requirement, but at the 11th hour and 59th second, they sprung a new one. And they sprung one that they had in their back pocket ever since and before they originally denied the claim. And that, of course, is that, oh, there's inadequate evidence in the record to support that Dr. Abatey was not disqualified from September of 1998 until April of 2000 from performing any occupation. Now, of course, the setting for that is that in September of 1998, Dr. Abatey was three months, two months shy of the age of 65. He had been diagnosed with non-Hodgkin's lymphoma six years before, a deadly progressive cancer of the lymphatic system. He had been ill for three years before that. He had been disabled off work since 1992. And now, according to the one paragraph legal memo that Dr. Kerry, the Alta's insurance physician, sent back, they've said there's inadequate proof that this man is not able to go back to work in some capacity. They acknowledged that he had this progressive disease, that he was disabled from November of 1992 until September of 1998. But this disabled physician, just reaching the age of 65, according to them, had not proven that perhaps he didn't have the ability to go back to work in a dime store or to do some other profession or job than what he had done. And they, in their letter of denial, evidencing their state of mind, in which their conflict became very evident, argued that by September of 1998, he was in the best medical condition that he had been in for many years. A man who, just shortly before, had had his spleen removed because his disease was so progressed. And they point to the doctor's records, which actually said, gee, his hemoglobin levels are at the best that they've been in years. And convert that into a claim that this doctor was in good health. Someone who was in the throes of a progressive fatal disease. Now, I think, really, just from a factual and honestly an emotional standpoint, that was evidence of a conflict. That is, of course, supported by virtue of the fact that this wasn't new evidence. They had that information all along and chose, for whatever reason, not to bring it forth when they originally denied the claims. And I know you'll agree that the dates were there. And the last point on this area is that in springing this information in June of 2002 and suggesting that this was an additional reason beyond the arguably discredited 12-month justification, that it was too late to do anything about it. This case, Judge Pregerson, is worse than the facts in Gebeon. At least in Gebeon, on the 119th day, the last day, they wrote and they said, gee, we need some more information. Here, they cut him off. They never told him before that there was any question about the impact of his disease. They never gave him a chance to answer. And in fact, Mrs. Abatey's counsel, me, wrote to Alta in August within the so-called 60-day appeal period and said, wait a minute. What are you guys doing? You've misquoted the medical record. He was not, went on and on. We never got a response. And obviously, your honors are more aware than I am that your court has repeatedly made clear that insurance carriers have, plant administrators, have an obligation when somebody is in a situation with a medical condition like this to engage in some kind of a dialogue. And I think that you are aware that at no time did Alta ever say he had the ability to go back. They said there's insufficient evidence, and clearly under the law, under many, many cases, that triggers the responsibility for them to say, we're not clear on that. The records that our doctor reviewed a year and a half ago haven't satisfied us that maybe he couldn't have gone back to some other job. Now, if that had occurred, we would have gone and we would have gotten the declaration, or something similar, which we subsequently offered in the trial court, of Dr. Mark Abate. Dr. Abate is no relation to Dr. Abate. He's a longtime oncologist in Santa Barbara. Dr. Abate provided the original supporting documentation. That's a good name for a doctor, particularly an oncologist. I'm wondering if he has a vanity plate by that same name, actually. He's a very excellent physician. But he originally provided the documentation in support of the claim before the lost documents were found, in which he indicated that he had treated Dr. Abate and that he had been disabled since 1992. And when that was questioned, in order to provide additional support to the trial court, Dr. Abate provided a declaration explaining what many would have thought to be obvious from the medical records. And that is that a 65-year-old physician, ill with non-Hodgkin's lymphoma for several years, nearly deaf, having had his spleen recently removed, was not in a fit condition to go back to work. Mr. Price, as a matter of coverage, do we have to find that the disability continued through that period in order to overcome the problem with the fact that he died after his 65th birthday and that coverage under the plan would ordinarily terminate for that reason alone? Let me start at the end. When you say coverage under the plan would have terminated, coverage under the plan wouldn't have terminated. Once he went on the waiver of premium, that coverage would continue. And he'd be entitled to the benefit. There is no termination at age 65. He's a continuant. That's part of the policy. And it was stipulated by the parties. Maybe I misunderstood from the briefing. I thought there was an argument made. Maybe I'll ask Mr. Lindahl. I thought there was an argument made in the brief that in any event, the coverage terminates at age 65. It may be the long-term disability plan. Well, in any event, I think that you would find that just to the contrary of what you were thinking is provided for in the joint pretrial conference order. There's no question that once the waiver of premium was submitted and approved, that his rights to obtain life insurance benefits were secured for however many years. Now, what happened under the policy, the only thing that happened is that the percentage of the $500,000 maximum payment increased with age. And because he was 65, he got 65% of the maximum benefit. 65% of $510,000 is the 331,500. So and I don't mean to go on here. I'm 66. He gets 66%. Is that the way it works? 65% of the. 65. But how about older than that? Then it graduates up to a maximum of $510,000. But you're paying additional premium along the way, right? If you happen to be working or retired and not disabled and not having qualified for a waiver of premium, you would continue to be paying premiums, of course. But there are not very many people in this category who become disabled. And so it doesn't become a significant financial issues for carriers. And that's why these benefits are offered and easily permitted as opposed to, for example, all of the disability claims that you see. Because a waiver of premium is something that people hardly look at twice, except in this case and maybe a few others. Now, I gave you what I thought was the most vivid example having to do with the medical situation, having to do with no opportunity for rebuttal or to supply additional information, and the fact that they had the information all the way along and that your court, this circuit, has previously said that you have to stick with the original decision for why you denied the benefit. You can't be pulling things out of your back pocket and putting them on the table. Or if you do, then that will be regarded as evidence that your conflict as a fiduciary may have influenced your decision, and therefore, the matter will be reviewed de novo. And of course, that goes to the heart of what I'm saying here. I'm not necessarily trying to establish that we automatically win, but rather that the wrong standard applied. Yes, Judge Beeser? Just because the employer is the trustee does not automatically show a conflict of interest, disabling conflict of interest. There may be a conflict of interest, but it doesn't show a disability from performing. I completely agree. I mean, the law is absolutely clear on that, and as has been stated so many times, in order for their conflicted position as a fiduciary to result in a de novo review, the challenging party has to present material probative evidence that that was the case. And I understand that that's the rules of engagement that you are bound by under the Supreme Court. And our position is that, through multiple instances in this case, that such a conflict was demonstrated as affected the decision-making of ALTA. In addition to the medical situation, where it's What cases do you cite for that? Proposition. Please back up for which particular proposition, Judge? The one you're just talking about. Well, Atwood says the same thing, essentially. Well, I mean, one of the cases is Gevion, and there's a whole string of cases, and virtually every case in this area recites the law. Going back to Lange and Frederick, Ingram looks at the conferral of discretion, and so there's just almost a clean line of precedent that requires that there be material probative evidence in which case an insurance company, who is both the payor and a fiduciary, will lose its discretion and have the administrative matter be reviewed. But when they pull out another reason at the last minute, as you've discussed earlier. That's right. That's one of them. They pulled out another reason. They didn't give Dr. Abatey or Mrs. Abatey any opportunity to add the evidence that they claimed was lacking. In Gevion, 119th day, they say, give us more information. Here, they cut them off. And so what are they supposed to do? That's precisely what happened. But in addition, when they denied the claim, finally, in June of 2002, Alta said, we cannot emphasize how important this 12-month rule is. I said, even if the records that you have produced are correct, and even if the employer submitted a waiver request in January of 1994, and that waiver was granted in February, but even if they had submitted the waiver request in January 2004, it would have been too late, because we have a 12-month rule. And you have to submit the waiver within 12 months of the commencement of the disability. That's what they said. Now, I'm not here to argue with Alta or to argue with the English language, necessarily, unless you want to go there, about what the policy means, because we don't have to. Because Alta took a totally contrary interpretation of that same language in this same case. Because we see, and it's been pointed out to your honors, that back when this claim was originally submitted in early 2001, Alta wrote to their reviewing physician, and they said, look, in order for there to be total disability, someone's got to be disabled for an initial period of six months. Would you please tell us whether or not Dr. Abatey qualified for this? And so they take this position that would seem to be the most reasonable position under the language. But whether it is or whether it isn't, the key thing is that they flip-flop, and they use this commencement interpretation, which Appellee's counsel says being wrong doesn't mean that they're conflicted. It's not merely that I think they were wrong. It's that they took two different positions. They flipped on their original position in order to justify their own position that there was no insurance coverage. I think that's a manifest display, albeit not nearly as vivid and impactful as the medical situation. I've also made the argument, of course, that I will gladly answer any questions you about having to do with the conferral of discretion. I don't think it's there under the Ninth Circuit cases. The only other point that I want to make has to do with the notice prejudice rule. I intentionally did not argue that other than to raise it in the briefs. I believe that it's a valid argument under a variety of cases, including the Cisneros case. But I chose not to argue it because I think there are far more compelling reasons to reverse this matter. And if the case were to be determined upon the basis of the notice prejudice rule, that would result in going back to the trial court, presumably, and having an argument or having evidence about whether Alta was prejudiced by virtue of the fact that they hadn't received notice of the claim earlier. And if that's the best that we can do on this appeal, then believe me, I'll gladly accept it. And so will my client. But I think that there are far more compelling grounds. I believe that if the court wished to and were of a mind, that there is also authority, particularly under the Lange case, to skip the step of remanding this for further review under a different standard by the trial court and to roundly reverse this case. Because it might sound like a cornball, but justice delayed is justice denied. And Mrs. Abatey ought not to have to wait, however, many more years before receiving the fruits of her husband's life insurance policy that he paid for, beginning with his career as a physician starting in 1971. And so I would respectfully request that you reverse this matter and grant us the relief that we see. Thank you, Your Honor. You exceeded your time by some 9 and 3 quarter minutes. I should have been paying closer attention. Thank you. May it please the court, I'm Dan Windahl representing the Appellee, the Alta Health and Life Insurance Company. The main issue before the court concerns the standard of review. And I see that we have a two-step process as we approach that issue. The first step is this, to look at the plan wording and decide whether that plan wording conferred discretion on the administrator. If your answer to that question is no, it did not confer discretion, then the case gets remanded for a de novo review. If your answer is, as the district court concluded, yes, the plan conferred discretion, then we move to the next issue of which we've just heard so much, whether, nonetheless, there should be de novo review because the administrator's decision was tainted by a conflict of interest. First, I'll begin with the issue of whether the plan wording here confers discretion. We only have unpublished decisions dealing with this particular wording. So what we have to deal with is the matching process that we go through with cases involving other wording and see where we fall. The Sandy case, the Burks case, the Van Dixon case, the cases that have addressed what is necessary to confer discretion on the administrator. Sandy versus Reliance Standards said, we're looking for wording that shows, in some or substance, that the administrator has the power or the authority or the discretion to decide claims. There's no particular word that's required. There's no magic word. But you have to have something that says or shows that this administrator has that power or authority. What we have here, in this case, the plan wording gives the administrator, ALTA, the responsibility for full and final determinations of claims and appeals of claims. And it also says that that responsibility rests exclusively with the company. And that's at ER 328. Now, this is very much like wording that this court found conferred discretion in the Burks case that we cite in our brief, which is at 293 F3rd 1139. There, the plan said the administrator had the power and the duty to decide claims. And this court said, that confers discretion. In Bendixson, the plan wording said the administrator had the full and exclusive authority to decide claims. And this court held that conferred discretion. In Sandy, the court cited with approval the Bogue case, which preceded Kearney. And Kearney certainly represented a milestone in ERISA law in this circuit. But in Sandy, the court said, here's a couple other examples of cases where we've found discretion was conferred. Bogue versus Ampex, where the plan said the determination will be made by the administrator. And Sandy said, that's an example of wording that confers discretion. Here, again, to go back to our plan, we have plan wording where also was granted exclusive responsibility for full and final determination of claims. That is certainly consistent with the wording in Burt and Bendixson that was held to confer discretion. And consequently, the district court was correct on that point here. So we move to the next issue. The plaintiff's contention that Alta's decision-making was affected by a conflict of interest, that it was that essentially, you know, they were, I think, the plaintiff says, determined to deny this claim under any circumstances, or something to that effect. And apparently, the plaintiff's primary point in support of that argument is the denial letter, the denial decision that came out in June of 2002, pointed out that there was a lack of evidence that Dr. Abatey had remained disabled throughout the period of the waiver of premium benefit. And Judge Tallman, while I'm thinking about it, let me try to respond right now to the question you raised, which is basically, what difference does it make, or how does that fit in here? As I understand it, the waiver of premium benefit ends at any point at which you are no longer disabled. If you look at ER 312, that's where that provision is. So that's why it matters. At that point, he would have had to make some other arrangements to keep the policy, or keep the coverage in effect. Well, did I just make the... I mean, we've had a number of insurance coverage cases on the calendar this week. Where did the age 65 issue arise? Did you argue that somewhere in your brief? I don't believe I did. Then I'm confusing you. I believe that there is a diminishing benefit after 65, but I didn't argue that. I thought, Mal, I thought there was some question as to whether the entire policy expired at age 65 for members of the clinic. But like I say, maybe I'm confusing this with the facts of another case. Or maybe you found something we didn't see. No, I probably didn't. But it's probably late now to raise that. It is late in the day, and my mind is wandering. No, I mean, it was probably late in the proceedings for all to raise that argument. You say there's a diminishing benefit? That's, as I see it, I can get to the side for you, but it looks to me like, I'll admit, this wasn't the focal point of the case, but as I understand it, the amount to be paid under the, as a death benefit, reduces depending upon the age of the... Decedent. Decedent. Okay. So, so we turn now to the question of whether there's this infected conflict of interest. So it doesn't pay that live long, no? Your Honor, I believe it, I hope to find out, but I believe it pays well. Okay. So the argument from the appellant is that the denial letter in June of 2002 cited as an additional basis the fact that there was evidence that Dr. Abatey had not remained continuously disabled from any occupation through the course of the waiver of premium. Now what's interesting about... That's the letter where they talk about that he's in good shape because of the hemoglobin. Yeah, because his doctor has said Dr. Abatey's doing very well. I've seen him in six years. And that no further treatment is indicated. Okay. That's... He was better in the past six years. And say he was better as a whole. Well... The hemoglobin was better. It said, it said a number of things. It said his white counts were improved. His hemoglobin was the best it had been in nine years. And that he didn't require any further treatment. That's, that's a pretty good indication that his health isn't in... If he's not receiving treatment for the condition... He's just not an extremist. He's got a disease where he's, you know, it's fatal. You don't give him any more treatment. Saving you money. Well, Your Honor, of course, there's... Let's, let me put this in context. The context is under an abuse of discretion standard or review, that decision, the question for the court, the district court, was whether there was evidence in the record from which that decision, or on which that decision could be based. And the district court said there was. Of course, here, the point that the plaintiff is making is that by even invoking that issue, it showed that the, that Alta was, was bent on denying the claim. What's so interesting about that is that the district court concluded, let's remember the district court concluded that that position had merit. The district court found that both that position, as well as the fact that no waiver of premium had been sent in timely, both had merit. And so it's a little bit ironic, I think, for the plaintiff to argue, they raised this and they sprung it on us at the last second as if it's some sort of bogus position, when in fact the district court found it was meritorious. Now, perhaps, and another interesting thing is this, the plaintiff has never argued. You couldn't- Was that brought up at the end, that issue about his ability to work, you know? It came up in the, there was an initial decision by the company, there was a lawsuit filed, there was a bunch of discovery done, and then there was a second decision. That was the- And then later, that came in later. Yes, it came in the second. That wasn't part of the original denial. Correct. The first denial was much shorter. So you'd always take somebody out and put them out there and lean them against the wall and give them a help, you know, and they'd earn money that way. No, I, you know, I mean, yeah. Well- See it all the time. I don't know if that qualifies an occupation. I'm pretty sure it wouldn't. Yeah, we've got 80,000 people in that occupation in Los Angeles. And we have many in Portland as well, far too many. Yeah, but Portland's more civilized. Well, that would be, I'd love to have that conversation, but I'm gonna get back to the conflict of interest question here, which is, and the other point I wanted to make was this. Now, if the plaintiff feels that the plaintiff was wronged by this allegedly late invocation of this defense, I think the answer is to argue you couldn't raise that in your second denial. You're stuck with the waiver premium argument that you raised in your first denial, but they didn't raise that argument. The plaintiff didn't. In fact, the plaintiff's arguments, as I've noted in the brief, have, are sort of constantly evolving. They raised the Jevian case, and there were- Your client's arguments are constantly evolving. Well, no, I- No, no, no. No, I haven't raised any arguments in my brief, and so- Well, I mean, these other issues that have come up are evolving. I think he meant not since 2002. Well, if I can, I'll... I mean- Let me ask you a question about Jevian. Yes, yes, go on. Maybe you can help enlighten me on this. I've been watching the status of the cert petition in that case, and the latest information I had is that it's still pending cert conference by the Supreme Court. They asked the Solicitor General to file a response. Do you have any further information on- I don't. Okay. I don't. Let me talk about the records position, because the plaintiff talked about the absence of records in the insurance company's possession, confirming that there was a submission of a claim for a waiver of premium benefit. Well, there's not an absence of records on the insurance company's side of this. There's just no records that a waiver of premium was ever supplied, and similarly, there's not an absence of records on the clinic's side. There's an absence of records on the clinic's side that any waiver of premium was sought. The clinic has lots of records concerning Dr. Abate's insurance matters, and we submitted those to the court in our supplemental excerpt of record. They have abundant records about Dr. Abate's insurance matters. They just don't have anything to confirm that this waiver of premium was sought other than these two memos that were found in the bottom of somebody's desk drawer after litigation was commenced. There's none of the records- You're not saying that's a forgery, are you? I don't know if they're a forgery or not, Your Honor. I said, no, I'm not saying they're a forgery, but what I'm saying is that other- Are you saying that they were, that was placed there after the lawsuit filed? I'm saying they didn't emerge until after the lawsuit was filed, and they are not accompanied by any of the records that would customarily be in the clinic's records, a doctor's statement, a submission of a waiver of premium request, a correspondence with the insurance company. All the things we find concerning Dr. Abate's other insurance matters, all the records that the clinic scrupulously kept concerning all other matters, it's only this one that they have no records. Nor, apparently, does the plaintiff have any records. Plaintiff, Carla Abate didn't come forward with anything indicating that she had records that she had received. But wasn't there something in the record that Dr. Abate did sign a request for a waiver? I think he was sent a waiver of premium form to be filled out. There's no- By the clinic. By the clinic. The HRP. And then- Correct. And then there's no- What's the lady's name? Carol or something. Which? Carol. The one that wrote that note down. Melissa Peter. Peter, right. So, wasn't there something there about that she sent it in to the carrier and then called and they said the waiver's granted, she wrote it down? No, what she said was, I have no recollection whatsoever of what happened. I can say I have this note that I believe I prepared, and that's what we have. So, I must have done something. I don't remember. I don't remember if I did it by mail. I don't remember if I did it by telephone. I don't remember who gave me approval. I don't remember how I got the approval. I don't remember anything about it was her testimony, other than I have this piece of paper and- That was a record. That's a record, yes. That's a record, and it's a record the district judge considered and found to be wanting in comparison with everything else that wasn't in the record. Well, I mean, as far as your client is concerned, your client has the third dance with these records, you know, that pass from one entity to another. Is that right? Records get lost. They can get lost. For all these years. That wouldn't, if that's the plaintiff's contention, is that- No, I'm just asking you. Can records get lost? Sure, they can get lost. It would be an odd coincidence that all of the records concerning this particular issue in the possession of the clinic, other than these couple of notes, were lost. All of the records on the insurance company's side- If they weren't lost, we wouldn't be here. Correct. So maybe they weren't lost. Maybe they never existed. Plus, when the insurance company, when Alta assumed the responsibilities of its predecessor companies on this risk- Well, I mean, this doctor's condition was on the records that your client got. Didn't they have a list of people where premiums were waived? No, he was not. He's not listed as a waiver of premium recipient. At any time? At any time. If he were, I'd- Yes, Your Honor. Mr. Lindahl, this was a case that was tried to the bench, correct? So we have findings of fact, and I guess based on the district court's order, we have to find that he was clearly erroneous before we can overturn those findings of fact. Is that correct? That is exactly right, and I'm glad you reminded me, and now I don't need- Well, we're not on summary judgment, which is what I was just trying to- Right. And I finally found, I'm glad to know I'm not losing my mind yet, on page eight of the district court's order in footnote four, he references the fact that the only way the plaintiff would be eligible for a life insurance benefit is if a waiver of premium had been completed at the time of Dr. Abate's departure from the clinic. We have no record of a waiver or record of Dr. Abate on the life insurance plan for retired physicians. Even if he had been on the life plan, that life benefit would have ended once Dr. Abate reached the age of 65. Are you looking at footnote four there? Footnote four of the district court's findings of fact and conclusions of law. Yeah, and he's quoting there from a clinic memorandum, and I honestly can't, I can't speak to the accuracy of the clinic's understanding of the policy's coverage concerning termination at 65. That's not my understanding, and it's not been an issue that we raised. I'm just glad to know that I was still on the same case. You, yeah, you plainly are. No, I- He's fully capable of working. We're not worried about it. He, from what I've observed, he's quite capable. He's here for life. We've got to put up with everything. That's right. I'm sorry. No, that's quite all right. In conclusion, in the final 34 seconds, I want to say this. If the court, for any reason, well, first of all, Your Honor, you're right. The question, your question of the, whether there was an abuse of discretion that affected this decision is a finding of fact. Unlike the decision whether the plan wording confers discretion, which is a question of law, but it is a finding of fact, which can only be reversed for clear error. If, for any reason that we've discussed today, the court finds that the wrong standard of review was applied, then under the authority of both Jebian and Sandy versus Reliance Standard, the appropriate remedy is a remand for review based under a de novo standard of review and not to simply deal with the issue. How does that work? Well, Your Honor. Why is it de novo standard? Because all these other things happen. Then you send it back to the district court and say, you used the wrong standard. Now use de novo. Sure. Yes, and what's interesting. He uses de novo. What does he do? Well, I guess he reads the record again and decides whether under a de novo, he feels the same way as he felt under the abuse of discretion. But what's interesting about this case, and I'm not sure he's. I never heard of a district court judging its decision where it exercised discretion and then being asked to look at it under de novo. Well, it's. The plan administrator that he's reviewed. The question is whether or not the plan administrator acted under an abuse of discretion or. Oh, I see. Okay. But it's. But it's. Yeah, okay. In other words, we're telling the plan administrator, you know, your discretion was abused. Now you look at it de novo. No, no, it's. Now we look at it de novo. Yes, it's the judicial review of the administrator's decision. We look at it de novo. The district court would decide anew how it would have. Are you confusing me? I'm sorry. Who decides it de novo? The district court judge would take this record and decide the issue essentially without regard to what the administrator did. I thought someone just said we decide it de novo. No, if you find the district court applied the wrong standard of review in reviewing the administrator's decision, then the district court will have to look at it again, applying, it'll decide that the case de novo. What's interesting, and I'm. I never heard of that, but so. I'm way past my time. But I wanted to point out what's, the reason there's usually a remand is so that the plaintiff can supplement the record with more stuff, because under de novo review, the district court will consider items that outside the administrative record. Here, that already happened. This district judge had all kinds of information from outside the record, including the three depositions. So that would, I think very little is likely to change if there is a remand. Are they trying to settle this case? I'm happy to talk about that. There were discussions, but they were untruthful. Thank you very much. Thank you. Seems like a very sympathetic case to me, but of course, I'm a bleeding heart, you know. Well, I agree with the one thing you said a minute ago, Judge Pregerson, about sending the same case back to the same judge. That's why I had requested that this court not send it back. Usually, you send- Oh, no, we are not sending it back. We rarely, I only know of one. I'll drop that one. No, don't. Drop that one. Don't, don't. Believe me, I can take a hint. Take a hint. We don't do that, except under, well, once every 20 years. And that was about Lange, so. All right. All right, I'll go with that one. I just remind you, when it comes to these, the record keeper can't find the papers. Under your decision, the circuit's decision in Shikori, it was stated that that was an insufficient ground. So it's not just from a commonsensical standpoint, but I'm talking about it from the standpoint of Ninth Circuit precedent, although that was an application of the mailbox rule. So there's a somewhat different context. I submit it. Thank you very much for all of your attention. Yes, good argument. Both sides, thank you very much. Enjoyed it. Very helpful. So is your client still in the room? She left. Oh, I guess she must have, was she sitting in the back? Yeah. Well, my back was, she left. Oh. Yeah, she left. Well, I couldn't tell because there were two, there were two unidentified blondes. And I noticed when she was. This was the older. Yeah, when you were talking, the lady in the back went like this. When he was talking, the lady in the back went like this. I figured that was his wife and he was. Ms. O'Donnell was my worthy opponent at a trial in this matter, Your Honor. Okay, well, are you married? No. No. I do weddings. No, it's not me. I do weddings too. Somebody's got to win. All right. Thank you all. Thank you. Have a nice weekend. For this session, the court stands adjourned. Not for five minutes, we're adjourned. All right, let's go to the second stand.
judges: Pregerson, Beezer, Tallman